Judgment rendered August 28, 2024.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 55,774-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

ROMULLUS DEVARIAN NOYES              Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 387,629

Honorable Donald E. Hathaway, Jr. Judge

* * * * *

LOUISIANA APPELLATE PROJECT          Counsel for Appellant
By: Paula C. Marx

ROMULLUS DEVARIAN NOYES                Pro Se

JAMES E. STEWART, SR.                      Counsel for Appellee
District Attorney

CHRISTOPHER S. BOWMAN
KENDRA JOSEPH
REBECCA A. EDWARDS
Assistant District Attorneys

* * * * *

Before STEPHENS, THOMPSON, and MARCOTTE, JJ.

MARCOTTE, J.

This criminal appeal arises from the First Judicial District Court, Parish of Caddo, the Honorable Donald E. Hathaway presiding. Defendant, Romullus Devarian Noyes, was convicted of second-degree murder under La. R.S. 14:30.1. Noyes was sentenced to life imprisonment, to be served without the benefit of probation, parole, or suspension of sentence. Noyes now appeals, arguing that his conviction should be reduced to manslaughter because his actions were in sudden passion or heat of blood. For the following reasons, we affirm Noyes's conviction and sentence.

## FACTS

In the early morning hours of February 15, 2022, Noyes arrived with his mother, Laquanda Huggens, at the Economy Inn and Suites ("Economy Inn") in Shreveport, Louisiana. After Noyes's mother gathered some personal belongings from the hotel, she became involved in an altercation with the victim, Jermond Chance Lewis, in the parking lot. During the altercation, Noyes fired 29 times from two different weapons inflicting ten gunshot wounds on Lewis before running over his body in a Jeep, killing him.

On February 26, 2022, a grand jury indicted Noyes for second-degree murder. Noyes pled not guilty. Following the empaneling of a 12-member jury, a jury trial was held August 7-9, 2023.

The jury first heard from the Shreveport police officers who responded to the scene. On arrival, Officer James Oates ("Off. Oates") noted an unoccupied black Jeep running in the parking lot before driving further on to a crowd of people where Officer Gregory Blue ("Off. Blue") was administering CPR to the victim.

Off. Oates assisted with CPR and did not see a firearm by the victim. When Off. Oates returned to the Jeep 30 to 45 minutes later, Noyes was there with a handgun in the passenger seat. Off. Oates detained Noyes for questioning. He testified that Noyes claimed he acted in defense of his mother, whom he had given a ride there to get some personal belongings.

When Off. Blue arrived on the scene, he assisted two females performing CPR on Lewis. He did not see a firearm by Lewis. While assisting with CPR, he learned that there may have been a weapon by Lewis, and he later recovered a gun from a vehicle belonging to Tai Hardaman ("Hardaman").

Hardaman, a registered nurse and instructor at LSUS, was dating Lewis. She testified that they had been "butting heads" that day and that she met up with him around midnight because he wanted to clear the air between them. While they drove around in her vehicle, Lewis received a couple of calls or texts before they ended up at the Economy Inn. Hardaman testified that she owned a 9-millimeter Glock that she had with her that night.

When they arrived at the Economy Inn, she stayed in the car while Lewis went inside to meet "Boosie." Lewis later returned to get her and said that they would be there a while. During her testimony, Hardaman identified parts of the Economy Inn's security video recordings showing what occurred. She went with Lewis to Boosie's room where several people were present. Hardaman recalled a commotion at the door. A woman she knew as "Sholanda" entered the room, and they began talking. Hardaman could still hear someone cursing and talking loudly outside the door, and she heard Boosie tell someone to get away.

2

Around then, Lewis walked out of the room. Within minutes, Hardaman heard numerous gunshots. Hardaman, who was armed with her Glock, pulled the weapon and tried to run outside but was stopped by Sholanda. The two women went out once the gunfire stopped. On the video that recorded their exit from the room, Hardaman pointed out the beam from her Glock shining as she looked for Lewis. When she found Lewis on the ground, she checked him and noted that both his hands were clear and empty before she began chest compressions. There was nothing around him. Hardaman said that she had tucked her Glock into her waistband and that it fell out on the ground while she was assisting Lewis. She eventually picked the gun back up.

The lead investigator on the case, Corporal Adam McEntee ("Cpl. McEntee"), conducted a recorded post-Miranda interview of Noyes that was published to the jury. Cpl. McEntee testified that Noyes was "fixated" on saying that Lewis had a gun. However, after viewing the security footage twice, Cpl. McEntee could not see that Lewis was armed when shot, so he arrested Noyes for second-degree murder.

Cpl. McEntee reviewed different videos that showed events preceding the shooting. Security cameras recorded what happened between Noyes's mother and Lewis just before Noyes opened fire. As described by Cpl. McEntee, Lewis did not appear agitated, and Noyes's mother did not appear fearful. She pushed Lewis, who stepped back. She then came at Lewis again, and he shoved her hand away. Lewis did not draw a gun or appear to have a gun in his hand. Cpl. McEntee testified that Noyes entered the video frame as Lewis's back is toward him and opened fire using a .22 caliber rifle and then a pistol.

3

In his interview, Noyes claimed that he pulled his rifle when he saw Lewis, whom he called "Chance," push his mother and go to draw a gun. He also fired additional shots from a pistol as Lewis was running. After shooting Lewis, Noyes ran over him with his Jeep.

Crystal Thompson, the general manager of the Economy Inn, provided security video recordings to the police, which were introduced into evidence without objection. She explained that the videos were timestamped an hour ahead of the actual time.

Officer Amber Futch, the crime scene investigator, testified as to all of the evidence recovered in the case. Of note, twelve 9-millimeter expended cartridge casings, plus seventeen .22 caliber expended cartridge casings were recovered from the crime scene and submitted to the crime lab for analysis along with seized firearms. The firearms seized from the scene included a 9-millimeter Sarsilmaz pistol from the hood of Noyes's Jeep, a .22 caliber rifle (GSG) from the trunk area of the Jeep, and Hardaman's Glock.

Dr. James Traylor, an expert in forensic pathology, performed Lewis's autopsy. He testified that Lewis sustained ten gunshot wounds, of which nine were penetrating and one was perforating. He removed ten bullets from Lewis's body; one was an old projectile from a prior incident. Dr. Traylor described Lewis's cause of death as multiple gunshot wounds and the manner as homicide. Though the toxicology report showed the presence of methamphetamine and THC, Dr. Traylor testified that the drugs were not a contributing factor in Lewis's death. On cross-examination, Dr. Traylor testified that abusers of methamphetamine can exhibit violent and irrational behavior.

4

Phillip Stout, the firearms section supervisor at the North Louisiana Crime Lab, testified as an expert in forensic firearms identification. Stout compared the 12 expended 9-millimeter cartridge casings to the two 9-millimeter firearms (Hardaman's Glock and Noyes's Sarsilmaz pistol) and determined that the expended casings were fired from the Sarsilmaz. Stout analyzed bullets recovered from Lewis's body during the autopsy. He compared those to bullets obtained by test firing into a water tank the .22 caliber GSG rifle recovered from Noyes's Jeep. He determined that the bullets recovered from four wounds on Lewis were fired from the .22 caliber GSG rifle.

The state rested and Noyes did not call any witnesses. The jury returned a unanimous verdict of guilty of second-degree murder. Motions for a new trial and for post-verdict judgment of acquittal were denied. On August 16, 2023, the trial court sentenced Noyes to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. The trial court denied a motion to reconsider the sentence on August 22, 2023. Noyes now appeals.

**DISCUSSION**

In his only counseled assignment of error, Noyes argues that his conviction of second-degree murder should be vacated and the responsive verdict of manslaughter entered because his actions were committed in sudden passion or heat of blood. Noyes does not dispute that the shots he fired killed Lewis. However, Noyes claims that he only shot Lewis because he perceived it as necessary to protect his mother. Noyes believed Lewis was armed and about to shoot his mother. Noyes admits that the surveillance video does not clearly show the victim with a gun but claims

5

that Lewis was known to carry a gun, and he thought Lewis was in the process of drawing his weapon.

Noyes also notes that the post-mortem toxicology reflected recent marijuana use and significant amounts of methamphetamine in Lewis's system at the time of his death, and that methamphetamine abusers can exhibit violent and irrational behavior. Noyes claims that while it is not known what happened inside the hotel room before the shooting started, Noyes believed his mother was afraid of Lewis, and he felt the need to protect her. While the jury rejected the self-defense / defense of others argument at trial, Noyes argues that his actions nonetheless were taken in sudden passion or heat of blood, thus his conviction should be reduced to manslaughter.

The state argues that the evidence presented at trial sufficed for any rational trier of fact to find the elements of second-degree murder beyond a reasonable doubt. The state claims that the established fact that Noyes fired two weapons multiple times inflicting ten gunshot wounds upon Lewis shows beyond a reasonable doubt that he had the requisite specific intent to kill or inflict great bodily harm for purposes of proving he committed second-degree murder.

The state also argues that the record does not support a finding of manslaughter, and that Noyes is simply repackaging his rejected claim that he killed Lewis in defense of his mother as a manslaughter committed in sudden passion or heat of blood. The state also notes that the surveillance video severely undercuts Noyes's claims because it shows that Lewis was unarmed and that Noyes's mother was actually the aggressor in the situation. The state further points out that even if Lewis was known to carry a gun, the

6

jury watched the video, which did not show him with a gun, and made a credibility determination in believing Hardaman's testimony that she was carrying the Glock and that it fell to the ground beside Lewis while she was performing CPR on him.

As for Noyes's reliance on Dr. Traylor's testimony about methamphetamine users possibly exhibiting violent and irrational behavior, the state points out that there was no testimony from anyone that Lewis actually exhibited such behavior.

*Manslaughter*

In the present case, Noyes was convicted of second-degree murder in violation of La. R.S. 14:30.1, which is defined, in pertinent part, as "the killing of a human being: (1) When the offender has a specific intent to kill or inflict great bodily harm[.]" Regarding Noyes's claim that he should have been convicted of the lesser offense of manslaughter, La. R.S. 14:31(A) provides, in pertinent part, that:

> (1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood had actually cooled, at the time the offense was committed; or

> (2) A homicide committed, without any intent to cause death or great bodily harm.

Accordingly, for murder to be reduced to manslaughter, the following must be proved: (1) the homicide was committed "in sudden passion or heat of blood"; (2) that sudden passion or heat of blood was immediately caused by provocation sufficient to deprive an average person of his self-control and

7

cool reflection; (3) the defendant's blood did not cool between the provocation and the killing; and (4) an average person's blood would not have cooled between the provocation and the killing. *State v. Kennell*, 54,577 (La. App. 2 Cir. 6/29/22), 342 So. 3d 437; *State v. Efferson*, 52,306 (La. App. 2 Cir. 11/14/18), 259 So. 3d 1153, *writ denied*, 18-2056 (La. 4/15/19), 267 So. 3d 1131.

A defendant who claims provocation, as a means of reducing murder to manslaughter, bears the burden of proving these elements by a preponderance of the evidence; additionally, provocation and the time for cooling are questions for the jury to determine according to the standard of the average or ordinary person. *State v. Leger*, 05-0011 (La. 7/10/06), 936 So. 2d 108, *cert. denied*, 549 U.S. 1221, 127 S. Ct. 1279, 167 L. Ed. 2d 100 (2007). The question for the appellate court on review is whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigatory factors were not established by a preponderance of the evidence. *State v. Burse*, 19-381 (La. App. 5 Cir. 2/12/20), 289 So. 3d 690, *writ denied*, 20-650 (La. 11/24/20), 305 So. 3d 104.

In the present case, the evidence presented at trial established that Noyes fired two weapons – the .22 caliber GSG rifle and the 9-millimeter Sarsilmaz pistol – multiple times, expending 29 casings and inflicting 10 gunshot wounds upon Lewis. The fact that Noyes's mother was involved in a slight altercation was not sufficient provocation to reduce the murder to manslaughter. Regardless of what they argued about, an argument does not reduce the offense to manslaughter. *See Burse*, 289 So. 3d at 697 ("An

argument alone does not constitute sufficient provocation to reduce murder to manslaughter.").

The jury weighed the evidence and made credibility determinations in reaching its verdict. It is not within the province of the reviewing court to reweigh the evidence or make credibility determinations. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442.

Noyes claims we do not know what happened inside the hotel and that his mother was afraid of Lewis. Contrary to his assertion, however, the jury heard some of what happened inside the hotel room from Hardaman's testimony, and the jury saw some of what preceded the shooting outside from the security video footage. The video footage refutes the unsupported claim that Noyes's mother was afraid of Lewis, since it shows her as the aggressor who pushed Lewis and put her finger in his face.

Nothing in Hardaman's testimony or the video footage supports Noyes's claim that the killing of Lewis was committed in sudden passion or heat of blood. To the contrary, the fact that Noyes fired two weapons at Lewis multiple times before running over his body in a Jeep shows that Noyes had specific intent to kill or inflict great bodily harm. Accordingly, Noyes's assignment of error claiming that his second-degree murder conviction should be reduced to manslaughter lacks merit.

*Pro Se Assignments of Error*

Noyes also asserts two pro se assignments of error. First, Noyes claims that the trial court erred by improperly charging the jury. Specifically, Noyes asserts that the trial court initially charged the jury under the felony murder doctrine with aggravated battery as the underlying offense, only to reinstruct the jury with armed robbery as the underlying

9

offense. Noyes notes that neither aggravated battery nor armed robbery was ever argued as applicable to this case. He asserts that the trial court's addition of armed robbery at the end of its charge "left the jury with a purely arbitrary avenue" to find him guilty.

Noyes, however, lodged no objection to the trial court's instruction to jurors regarding alternate theories of guilt. The trial court even asked whether the parties had any objections to the jury charges, and defense counsel responded in the negative.

A defendant's failure to object to the district court's jury instructions precludes him from challenging the instructions on appeal. *State v. Williams*, 55,537 (La. App. 2 Cir. 2/28/24) 381 So. 3d 287, 294 (holding that "the failure of defense counsel to contemporaneously object to the jury instructions waives review of these issues on appeal"); *State v. Sandifer*, 16-0842 (La. App. 4 Cir. 6/27/18), 249 So. 3d 142, 149, *writ denied*, 2018-1316 (La. 3/25/19), 267 So. 3d 593, and *writ denied*, 18-1261 (La. 3/25/19), 267 So. 3d 599, and *writ denied*, 18-1310 (La. 3/25/19), 267 So. 3d 600 (citing La. C.Cr.P. art. 841(A) (providing that "[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence")).

Even assuming Noyes had lodged a timely objection, any error the trial court may have committed in providing jurors with alternate theories of guilt was harmless as the evidence was sufficient to support a finding that Noyes had the specific intent to kill Lewis or inflict great bodily harm. The jurors clearly did not accept Noyes's theory that he was acting in defense of his mother.

Because the evidence was sufficient to support second-degree murder as a specific intent crime, any error the district court may have committed in

providing jurors with alternate theories of guilt was harmless.  Noyes suffered no violation of his constitutional rights.

For Noyes's second pro se assignment of error, he argues that he was denied the effective assistance of counsel when his lawyer failed to call two witnesses at trial, Atari Caldwell and Laquanda Huggens.  Noyes asserts that Caldwell and Huggens gave information to investigating officers that supported his defense of having a reasonable belief that his mother was in imminent danger to life or great bodily injury.  Specifically, Noyes asserts that Caldwell, in her statement to police, identified a small black .32 caliber gun lying next to Lewis's body when she first arrived, and that Huggens reported her belief that Lewis had a gun.  Noyes claims that his trial counsel's failure to interview and call Caldwell and Huggens as witnesses prevented him from asserting an "imperfect self-defense" theory and rendered his lawyer's assistance so deficient that he was deprived of his constitutional right to effective counsel.

The right of a defendant in a criminal proceeding to the effective assistance of counsel is mandated by the Sixth Amendment to the U.S. Constitution.  *State v. Wry*, 591 So. 2d 774 (La. App. 2 Cir. 1991).

Claims of ineffective assistance of counsel are more properly raised in an application for post-conviction relief in the trial court because it provides the opportunity for a full evidentiary hearing under La. C. Cr. P. art. 930. *State v. Reese*, 49,849 (La. App. 2 Cir. 5/20/15), 166 So. 3d 1175, *writ denied*, 15-1236 (La. 6/13/16) 192 So. 3d 760.  When the record is sufficient, however, allegations of ineffective assistance of trial counsel may be resolved on direct appeal in the interest of judicial economy.  *State v. Ratcliff*, 416 So. 2d 528 (La. 1982).

11

In the instant case, this court does not have a complete record on which to review any of Noyes's brief statements and unsupported allegations of ineffective counsel. An application for post-conviction relief will afford Noyes the opportunity to develop evidence with regard to his claims.

Moreover, a full evidentiary hearing will allow the trial court to review facts and determine the merits of his claims. Thus, Noyes's ineffective assistance of counsel claims should be relegated to post-conviction relief.

## CONCLUSION

For the foregoing reasons, Noyes's conviction and sentence are affirmed.

**AFFIRMED.**